## CUTLER–HAMMER MFG. CO. v. GENERAL ELECTRIC CO. et al.

(Circuit Court of Appeals, Seventh Circuit. September 19, 1924. Rehearing Denied May 26, 1925.)

No. 3386.

1. Patents ⬢328—No. 1,367,341, constituting electric heating element, valid, and not infringement of others.

Abbott patent, No. 1,367,341, issued February 1, 1921, consisting of electric heating elements of the type in which a resistance conductor is inclosed in a metallic sheath insulated from it by a thin dense layer of insulating material, *held*, valid, and manufactures under it are not infringement of Lightfoot patent, No. 1,359,400, issued November 16, 1920, or Schneider patent, No. 1,263,351, issued April 16, 1918.

2. Patents ⬢127—In proceeding under statute for avoidance of interfering patent, courts not limited to question of priority alone.

In proceedings under Rev. St. § 4918 (Comp. St. § 9463), for avoidance of interfering patent, courts are not confined to narrow issue of priority alone, but may consider any issue respecting validity of either or both of patents, and fact that novelty has been urged in procuring either patent may be considered as evidence thereof, when want of novelty in both patents is urged.

Appeal from the District Court of the United States for the Eastern District of Wisconsin.

Suit by the General Electric Company and the Edison Electric Appliance Company against the Cutler-Hammer Manufacturing Company. Decree for plaintiffs, and defendant appeals. Affirmed.

W. Clyde Jones, of Chicago, Ill., for appellant.

Edward Rector, of Chicago, Ill., for appellees.

Before EVANS and PAGE, Circuit Judges, and FITZHENRY, District Judge.

PER CURIAM. Upon the trial of this suit in the District Court, the District Judge filed a written opinion, which is printed below. Our study of the same questions upon appeal has led us to the same conclusion. We have concluded to adopt the opinion. The decree is affirmed.

The complaint avers that the plaintiff General Electric Company is the owner of the Abbott patent, No. 1,367,341, issued February 1, 1921; that the coplaintiff Edison Electric Appliance Company is its exclusive licensee; and that defendant infringes such patent. The plaintiffs also aver that the defendant holds the patent issued to Lightfoot, No. 1,359,400, November 16, 1920; that the latter is an interfering patent; and plaintiffs pray for relief as upon infringement of the patent, and also for an adjudication under section 4918 of the Revised Statutes (Comp. St. § 9463) for the avoidance of said Lightfoot interfering patent.

The defendant by answer put in issue the allegations of the complaint, viz. the validity and alleged infringement of plaintiff's patent, and denied the interfering character of the Lightfoot patent and the jurisdiction of the court to determine such issue. By counterclaim it further set up the Lightfoot patent and charged the plaintiff with infringement thereof; set up the Schneider patent, No. 1,263,351, April 16, 1918, and charged plaintiff with infringement thereof. The

plaintiff, in reply, took issue upon each of the counterclaims. After the commencement of the suit the defendant filed in the Patent Office a disclaimer of much in the Lightfoot patent, upon the trial withdrew its counterclaim thereof, and the case was tried upon the complaint, the answer, the counterclaim, and reply thereto, upon the Schneider patent.

GEIGER, District Judge. [1] Certain preliminary observations respecting the parties and their relationship to the art involved may be made. Plaintiff General Electric Company and defendant are prominent in the electrical appliance art, large manufacturers (I assume they rank as or with the largest); each devotes itself extensively and aggressively to keeping abreast with the scientific side of electrical development, and to that end seeks to maintain, and doubtless maintains, a staff committed, not to mere artisanship, but to high explorative and inventive endeavor. Abbott and Lightfoot, in their labors, in their representations, which led up to and are embodied as claims in the patents issued to them, were and are the parties hereto, General Electric Company and the Cutler-Hammer Manufacturing Company. These observations, though not based upon evidence directed to their establishment, are yet founded upon the record and upon concessions made in the trial of the case.

When this much is premised, then, in the absence of a countervailing record, courts should certainly ascribe to each of these representatives of the parties, not only the high professional skill and abilities which his labors prima facie exhibit, but also good faith and good conscience back of his assertions that in fact he exerted skill and endeavor of the dignity of invention in an art wherein he professes to be a master. In other words, courts should recognize that each of the parties here in good faith represented upon the applications for patents that something had been invented—something useful, theretofore unknown, and which, upon the promptings of superlative effort, became known as contributions to the art. In this situation, the plaintiff, averring its patent as embodying the inventive accomplishment of Abbott, charges in its bill that defendant has a patent covering identical subject-matter, granted by the government to Lightfoot, but without right, because of Abbott's priority, and section 4918 of the United States Statutes grants the remedy sought by plaintiff as upon "interfering" patents. Upon this funda-

mental aspect of the plaintiff's case, it was observed by the court at the close of the testimony:

"Broadly speaking * * * dealing with the evidence of the prior art, I have gained the impression that, regardless of what must be held, the plaintiff and defendant here, speaking through Abbott and Lightfoot, as late as 1918 and in 1920, certainly thought there was an inventive field wherein endeavors might be exerted as both Abbott and Lightfoot exhibited them in the claims of their patents. Speaking offhand, these two patents, Lightfoot's and Abbott's, had the question been raised in the Patent Office, would unhesitatingly have been held to be interfering patents. That being true, it would hardly be probable that each side, conceding the interference, would none the less claim that the other's patent was void [for want of novelty]."

[2] Counsel for the respective parties doubtless recognized the predominance of view entertained by courts respecting the more liberal interpretation to be given to section 4918; that, though conceived by some courts to afford a remedy wherein the narrow issue of priority alone is to be determined, it has been later and more generally held to open the door for consideration of any issue tendered by either party respecting the validity of either or both of the patents. The difficulties attending either interpretation are well pointed out in the cases dealing therewith. Dittgen v. Racine Paper Goods Co. (C. C.) 181 F. 394; Palmer Pneumatic Tire Co. v. Lozier, 90 F. 733, 33 C. C. A. 255; Contra: Pentlarge v. Pentlarge (C. C.) 19 F. 817; Lockwood v. Cleveland (C. C.) 20 F. 164. And counsel probably have proceeded upon the later view found in General Chemical Co. v. Blackmore (C. C.) 156 F. 968, and Nikola Tesla Co. v. Marconi (D. C.) 227 F. 903, rejecting the earlier doctrine of the Pentlarge Case in the same court. Conceding, as suggested in the Lozier Case, that courts should not be compelled to pursue an "unprofitable inquest" to determine priority between two patents, neither of which may be valid, there is yet good ground for treating the adversaries, each of whom has received a grant from the government, as estopped by the reception of the grant from avowing want of patentable novelty. So, when from November, 1918, to November, 1923, the parties hereto and their respective "inventors," Lightfoot and Abbott, solemnly and persistently asserted that patentable subject-matter resulted from their efforts, and when in court, almost to the day

of trial, like insistence is made, there are persuasive reasons why the jurisdiction should be limited, to the end that the parties be bound by their previous attitude in the issue of patentable novelty. Neither should be heard to gainsay his original purpose, and in lieu thereof seek merely to protect his subsequently developed pecuniary interest which has been founded, so he insists, upon his monopoly; nor should he be permitted to assume too great solicitude 'for the rights of the "public." I feel that there is much in support of a limitation of the jurisdiction to the single issue, thereby estopping the holders of interfering grants from asserting that both were "pretenders." Pentlarge v. Pentlarge, supra. The considerations for such estoppel are no less cogent or less wholesome than those which in other situations preclude denial of patentable novelty or validity of a patent.

But, accepting the case as properly tendering the issues which the parties have litigated upon the evidence, the observations just made must, in any event, recur to the court in considering what evidence bears pertinently and persuasively upon resolving the issue of Abbott's invention now tendered by the defendant's answer, and by its counterclaim on the Schneider patent. But this is meant: That if Abbott and Lightfoot be credited, as noted, with great ability, with a masterful knowledge and appreciation of their art, and with good-faith assertions respecting the recognition which their labors justly entitled them to receive, with the bestowal of their exertions on behalf of the respective parties hereto, then each, and each of the parties, at the threshold, has furnished to the other, and to the world, testimony bearing pertinently upon the issue of inventive novelty—testimony which is clearly the equivalent in its probative effectiveness, of admissions or declarations solemnly and deliberately made by an adversary.

Thus the herein defendant by answer put in issue every matter of fact tendered by the complaint upon the issues of interference, validity, and infringement (as between Abbott and Lightfoot). It further by counterclaim set up Lightfoot as a valid patent infringed by plaintiff, then upon the trial conceded priority to Abbott. Certainly it cannot complain if plaintiff resort to the attitude assumed and the course pursued by Lightfoot and the defendant, both in prosecuting his application and in this case, as strong evidentiary support for, and indorsement of, the claims made by plaintiff respecting the quality and dignity of Abbott's iden-

tical though prior endeavors; nor complain if the presumptive validity of the government's grant be claimed to be thereby fortified, or that the burden of overthrowing such grant be thereby augmented. And the fact that defendant upon the trial withdrew the Lightfoot counterclaim need not disparage the plaintiff's right to so resort to such attitude and course.

Therefore the case necessitates a consideration of the prima facie showing found in both the Abbott and Lightfoot patents; their representations and claims; the prior art references; the position of the defendant in its answer, in its counterclaims upon Lightfoot and Schneider; and particularly its present position (1) respecting both Abbott and Lightfoot, and (2) that Schneider (whose patent defendant bought during the pendency of Abbott's application, and which it owned and held at the time of Lightfoot's application) should now, in effect, be held to dominate the art in question.

Coming first to the patent granted to Abbott, he says therein:

"My invention relates to electric heating elements of the type in which a resistance conductor is inclosed in a metallic sheath and insulated from it by a thin dense layer of insulating material. Resistance elements of this general type are now in common use in electric heaters and the like, and are known as 'sheath wire' elements. One of the characteristic features of this resistance element is that the insulating layer between the conductor and the sheath is very thin and very closely compacted, so that the conductor is in very intimate thermal relation with the sheath. The usual method of producing such a resistance element is to locate a straight resistance conductor, which may be called the core wire, centrally of a metallic tube which is to form the sheath, and fill the tube with an insulating powder, such as magnesia, so as to completely embed and properly center the core wire. The ends of the tube are then plugged, suitable provision being made for the ends of the core wire which extend beyond the tube, and the tube is subjected to a reducing process. The result of this operation is the reduction of both the sheath and the core wire, with the consequent compacting of the insulating material. The arrangement is such that, when the core wire is reduced to its desired size, the insulating material is so thoroughly compacted that it becomes practically a unit with the core wire and may be drawn or rolled like a solid metal. This element, being supplied with the proper terminals, constitutes an efficient

heating unit, since it is exceedingly rugged and requires no insulating support; the core wire being well insulated and protected from mechanical injury. Such a resistance element naturally has its limitations, since the space available for the heating element is not always sufficient to contain the length of conductor necessary to produce the required resistance. This is particularly true where the element is to be used on a circuit of 220 volts or higher.

"I have found that sheath wire having a helical or sinuous conductor, instead of a straight core wire, may be produced having all the advantages of the above-described straight conductor sheath wire in addition to advantages of its own. The principal advantage of this form of unit lies in the fact that a much greater length of core wire may be contained in a given space, so that the unit is much more compact and self-contained, and is readily adapted to the higher voltages without occupying increased space. There are other advantages, however, both from the standpoint of the manufacture and of the utility of the unit itself which are important. One of these advantages arises from the fact that the core wire is not reduced in diameter by the reduction of the sheath. Since the core wire is not drawn down, a grade of wire which is difficult to draw, but which may be more suitable, may be used. A greater thickness of insulating material, which will give greater margin of safety to the electrical insulation, may also be used, since the core wire is not reduced; whereas, in reducing straight core wire, if the thickness of the insulating material is above a certain maximum, the core wire will not be drawn down properly. Furthermore, the core wire retains its surface left by the drawing dies, and a smaller wire may be used than would be safe where it is drawn down in the tube. There are also certain other advantages, such as simplified terminal connections, greater latitude in the grade and character of the metals used for the sheath.

"In accordance with my invention, therefore, a sinuous or helical resistance element is centrally located in a metallic sheath filled with powdered insulating material, which is compacted to a high degree, so as to form a very dense insulating body having relatively high heat-conducting properties, so that the heat will be transmitted to the sheath at the greatest possible rate consistent with good electrical insulation, thereby producing a mechanically rugged resistance element capable of embodying a high resistance in a relatively small space."

Upon these specifications and others, which give in detail the construction and advantages of the new combination, there were awarded to Abbott 14 claims; 7 dealing with the product and 7 with processes or method of forming or making. The following will be taken as typical:

As to product:

Claims 1 and 2 combined: "An electric heating unit comprising a metallic sheath, powdered heat refractory insulating material compacted to a hard dense mass within said sheath and a sinuous helical resistance element embedded in said mass so as to readily conduct heat from the resistance element to the sheath."

"(3) An electric heating unit comprising a metallic sheath, powdered heat refractory insulating material compacted to a hard dense mass within said sheath, a sinuous resistance element embedded in said mass, so as to readily conduct heat from the resistance element to the sheath, and terminal members secured to the element and projecting from the sheath."

As to process:

"(7) The method of forming a resistance unit which consists in mounting a sinuous resistance element in a metallic sheath, filling the space around the element with a heat refractory insulating material and reducing the sheath sufficiently to thoroughly compact the insulating material around the resistance element."

"(11) The method of forming an electric heating unit which consists of mounting a helical resistance element in a metallic sheath, filling the space around the element with a heat refractory insulating material, compacting the material around the element, and finally compacting the material still further by reducing the sheath."

Turning to the patent issued to Lightfoot, he says:

"The heater to which this invention particularly applies comprises in general an elongated tubular jacket or casing, a terminal rigidly fastened to each end thereof, a resistor arranged within the jacket and connected between the terminals, and insulation between the resistor and the jacket."

"Among the objects of the invention is to provide a heater which is complete in itself, which is efficient and durable, and which may be readily and economically manufactured. Another object is to provide a heater which is bendable into different forms and which, due to its inherent structure, will retain the form into which it is bent.

"In accordance with this invention the re-

sistor is helical or winding and the insulation is compacted and compressed thereon. The jacket is ordinarily contracted crosswise, to thoroughly compress and compact the insulation. The compressed and compacted insulation firmly holds the resistor in shape and in place, and insulates it from the jacket, and its turns or convolutions from each other. The helical or winding resistor may have its turns or convolutions extensively varied in diameter and number per inch to vary throughout a wide range its ohmic resistance for a helix of given length or a given external heated surface."

The applicant thereupon enumerates 18 "advantages" of "the heater made in accordance with this invention"; the specifications, with the drawings and illustrations, give in detail the construction of the "heater," the "jacket," the "resistor," the "terminals," the "insulation," and a "filling machine"—a subject of separate claims. Upon such elaborate specifications Lightfoot was awarded 28 claims; 22 covering the product, and 6, the process or method of making. Typical of such claims are:

"(1) An electric heater complete in itself, comprising a winding resistor, insulation compacted and compressed around and about the same, a tubular metal jacket surrounding the insulation and contracted crosswise thereon to compact and compress the same, and a terminal rigidly fastened to the jacket and connected to the resistor."

As to process: ·

"(23) The process of making an electric heater which comprises placing a winding resistor within a tubular metal jacket, filling the space around and about the same and the jacket with insulation, and contracting the jacket crosswise to compact the insulation and compress it upon the resistor, so that the resistor and its convolutions are firmly held in place and the resistor insulated from the jacket and its convolutions from each other."

As with Abbott, the claims cover variations of the different elements both in product and process. For example, the resistor is stated to be "sinuous," "helical," "winding"; the "sheath," a "jacket," a "metal jacket," a "ductile tubular metal jacket," etc.; and the insulation is particularized, e. g., as "magnesium oxide," "powdered" or "granular," etc., and "terminals" are ."fastened," "rigidly fastened," etc.

Upon this partial statement and comparison of these two patents, no escape is possible from the conclusion of identity of structures and processes, and the defendant's concession of the interfering character and also

the juniority of the Lightfoot patent could at no time be avoided. Therefore, passing the evidentiary character of Lightfoot's endeavors, his representations and claims, also the evidentiary character of the position heretofore taken by the defendant, as his principal, we are brought to a consideration of the present insistence that, upon the art, neither Abbott nor Lightfoot invented anything. There have been exhibited to the court and are pressed in support of this contention patents granted from 1890 to about the date of Abbott's application (1918). The limits of an opinion will not permit extended discussion, but the situation demands some reference to the art and to its progress as thus exhibited. And it may be again suggested that, if the defendant's contention is to be seriously entertained, certainly if it is to be upheld, it is difficult to find an explanation for the granting of so many patents during the period noted. It is still more difficult to understand the insistence, initially, by each of the parties to this action upon the inventive quality of the exertions of Abbott and Lightfoot respectively.

The defendant calls to the court's attention this list of patents: Borel, British, No. 4,346, October 29, 1878; Farrall, 423,421, March 18, 1890; Wittingham, 547,979, October 15, 1895; Rider & Lewis, 516,167, March 6, 1894; Wittingham, 537,876, April 23, 1895; Wittingham, 579,459, March 23, 1897; Hadaway, 620,307, February 28, 1899; Wittingham, 712,749, November 4, 1902; Wirt, 795,747, July 25, 1905; Thomson-Houston, British, 18,685, August 5, 1915; Moore, 1,-107,233, August 11, 1914; Kearsley, 1,213,-881, January 30, 1917; Read, 1,192,457, July 25, 1916; Whitney, 1,093,512, April 14, 1914. To these we add patents offered by the plaintiff, bearing upon the Schneider counterclaim: Smith, 579,611, March 30, 1897; Leonard, 522,718, July 10, 1914; McLaughlin, 490,082, January 17, 1893; Ball, 699,-064, April 29, 1902; Alberger, 211,681, January 28, 1879.

Now, upon inspection of these various grants, and without any attempt to determine their scope or validities, respectively, nor to deal with a nicety concerning what, if any, novel advance each made upon its predecessors, we are brought to a concession which must be made and is made by the parties hereto; that there is disclosure of combinations, of elements of combinations, which were not only within the cognizance of Abbott (also Lightfoot), but which were in fact introduced and fully availed of in the two patents applied for by them. Neither appli-

cant claimed—could claim—to have discovered or invented a resistance coil, a helical or winding resistor, or the material of which either is made, insulation of one kind or another, a tube or a sheath, bendable or not bendable, or the terminal alone, nor could either claim to have been the first to have conceived a device of a "unitary" or "self-contained character." And, further each was obliged to to recognize, and is bound here to concede, that notwithstanding the number of structures brought to the attention of the court, no one, as the parties themselves interpret the art, "reads upon"—as it is frequently expressed—the structures here in suit.

It would not only be odd, but undoubtedly surprising in the estimation of the parties to this suit, if, 33 years after its date, Farrall's patent should be credited—in the light of the numberless later patents—with having substantially covered the exploratory field of "practical methods and means for generating heat, steam, and light by electricity"; or that Wittingham, in any one or all of his four patents, even approximated identity with the structures in suit because he used a helical wire in the construction either of a rheostat or a heater, and suggested an advance upon Farrall's "cartridge" when he indicated the use of a glass tube, or other means of preventing contact between the wire and the tube or sheath, or brought out a "bendable" structure. If one thing appears more clearly than another upon the examination of the art as disclosed by those patents, it is the succession of new steps in processes, of new structural elements, the later taking the place, by way of addition or supersession, of the earlier. It is entirely clear that, after the introduction of the idea of reducing by swaging, rolling, or other similar processes, the cross-section of a structure, its value was well appreciated, but it brought difficulties and retained disadvantages not to be overcome by any obvious method. So that at some time between 1910 and 1918 the endeavors of workers in the art seem to have been committed quite directly to the development of the straight core wire.

No one can read the quite pointed discussion in the patent to Thomson-Houston Company and escape the conclusion that not only were the Wittingham patents ignored as affording a solution of the problem of further possible development, as the art then stood, but that in the development of the structures like Whitney and Thomson-Houston Company, viz. the straight core and swaged wire, no one apprehended that the helical wire—as is now seen—would at once afford a means of not only overcoming the many difficulties and shortcomings of the straight core, or that advantages not theretofore enjoyed (now freely conceded) would result. It is said in the latter patent:

"Attempts have been made heretofore to produce a compound wire, in which a conductor is surrounded by and insulated from an inclosing metallic tube. For instance, it was early discovered that, if a copper wire were inclosed in an iron tube and insulated from it by an insulating material, such as glass, the tube and wire might be reduced in size simultaneously while maintaining the wire concentric with the tube insulation. Various methods of reducing the size of the tube and its inclosed wire, which, for convenience, may be called an 'ingot,' were suggested, such as rolling, drawing, etc. It was suggested that the ingot might be heated to melt the glass, and the ingot could then be reduced by a forging while hot. All of these methods failed in practice, and in fact prior to our invention no wire of this character was ever made in a commercial way. We have found that, in order to successfully produce such a wire, especially for resistance purposes, where the uniformity of the inner core is extremely important, a condition which approaches as nearly as possible one of homogeneity throughout the wire must exist; that is, the insulating material must be of such a character and must be so treated that it becomes to all intents and purposes a metal having insulating properties. We have discovered that certain granular insulating materials may be compacted so hard that they become practically a unit with the inner wire and the outer sheath, and that, when so compacted, the compound wire may be worked like an ordinary metal; that is, it may be drawn and wired. Unless the insulating material is brought to this condition, the outer sheath will draw or stretch independently of the insulation and the inner core, so that the inner core is liable to break, or, the sheath not being firmly and uniformly supported on its inner side by insulation, it will wrinkle and split longitudinally."

This extended reference is pertinent in connection with the structure disclosed in the Whitney patent. The latter, although dealing quite specifically with a form of terminal, seems to exemplify the state of the art, prior to the advent of Abbott and Lightfoot, and seems closely allied to the structure and processes referred to in the Thomson-Houston discussion. The significance of the art, as it then stood, is this: That the problem of finding a more satisfactory structure was

still pressing; that it concerned, not merely a determination of elements in the product, but also processes of manufacture. Thomson-Houston deals with it as involving a sheath, insulating material, and a rod, which by processes are to be reduced to a substantially uniform condition of great density. It deals with the acuteness of the difficulty of applying processes through which the uniform density and homogeneity of the core wire be retained. It points out the advantages arising from drawing both the sheath and the wire—that is, the problem of retaining a correspondence between the initial rod or core and the tube as ultimately reduced.

Now, in this consideration of the art, we may recur to representations of Abbott: "The principal advantage of this form of unit (the helical conductor) lies in the fact that a much greater length of core wire may be contained in a given space, so that the unit is more compact and self-contained, and is readily adapted to the higher voltages without occupying increased space. There are other advantages, however, both from the standpoint of the manufacture and of the utility of the unit itself, which are important. One of these advantages arises from the fact that the core wire is not reduced in diameter by the reduction of the sheath. Since the core wire is not drawn down, a grade of wire which is difficult to draw, but which may be more suitable, may be used."

Upon the testimony in this case, given on behalf of both plaintiff and defendant, the showing in support of the distinctiveness of the Abbott structure, both mechanically and in its resultant advantages, really appears without the possibility of serious controversy. No one has suggested—the defendant or Lightfoot cannot suggest—that the structure is without great merit, or that the advantages claimed are apparent or nominal only, and in truth resided in the straight core wire. Nor does the proof lend any support to the broad position, which the defendant must take, that in the art, there was any other combination, either in product or in the steps of the processes, which approached and now approaches Abbott as a real rival, and an acceptable, plainly equivalent, alternative choice. It is probably true that some of the prior art structures are to-day availed of by those interested in the art, including possibly the parties hereto; but it is not and cannot be true, upon the proofs in this case, that the structure developed by both Abbott and Lightfoot does not embody a very material advance.

So, when the court gives great weight, as it feels impelled to give, to the product and processes disclosed by Abbott upon prima facie comparison with the rest of the art—all of which is emphasized by the position taken by Lightfoot—everything that the defendant presses may be reduced to this: That the prior art, its combinations and various elements, be summed up by way of addition, and that there then be made, not merely subtractions or substitutions, but that such subtractions or substitutions, as, against Abbott, should now be held to have been obvious. Of course, such a holding would grossly impugn the intelligence of Lightfoot and his principal, and would very seriously question their sincerity in applying for a patent and also their position initially taken in this lawsuit. The court finds no difficulty in upholding the Abbott patent.

If the view thus far expressed is tenable, it suffices to apply it, as is intended, to the counterclaiming Schneider patent. I think counsel for the plaintiff was justified in his broad statement upon argument that prior to this lawsuit no one had ever given, or attempted to give, to Schneider the dignity now asserted by the defendant. Upon this phase of the case, the latter's position, in view of its ownership of the Schneider patent at the time when Lightfoot was prosecuting his patent, and in view of Lightfoot's representations, strikes me as one of quite inexplicable repugnancy. A comparison of Schneider with either Whitney or Thomson-Houston patent at once places it rather in subordination than in equal rank with either. The Patent Office so regarded it when, upon earlier patents, it was held in a state of rejection for something like 8 years. Lightfoot and the defendant so regarded it—or should now be held to have so regarded it—when it was solemnly asserted that Lightfoot's (Abbott's) structure possessed 18 advantages over any prior art structure.

The proofs in this case, adduced by the defendant—see, among others, Exhibits L3, M3, N3, O3, show the Schneider construction and method and its interpretation as the Patent Office initially adjudicated it. That was why it was rejected. After 8 years, as shown by the file, it was rescued and passed to allowance upon introducing a narrow element: "Means being provided for reducing the running temperature of the resistor at the ends of the heating unit below that prevailing throughout the remainder of its length." Such being the case, the validity of the Schneider patent, in any aspect, becomes immaterial; because the plaintiffs in no event infringe.

Plaintiffs may therefore take a decree: (1) Agreeably to the prayer of the complaint; and (2) dismissing the counterclaim for want of equity.