28 C.C.P.A. (Patents)

### VICKERY v. BARNHART.

### BARNHART v. VICKERY.

Patent Appeals Nos. 4425, 4426.

Court of Customs and Patent Appeals.
March 31, 1941.

Frank M. Slough, of Cleveland, Ohio (Waite, Schindel & Bayless and Herbert Shaffer, all of Cincinnati, Ohio, of counsel), for Vickery.

Samuel W. Banning and Ephraim Banning, both of Chicago, Ill., and Frank L. A. Graham, of Los Angeles, Cal., for Barnhart.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

LENROOT, Associate Judge.

These are appeals in an interference proceeding wherein the Board of Appeals of the United States Patent Office affirmed a decision of the Examiner of Interferences awarding priority of invention of the subject matter of counts 1, 4 and 6 to the party Barnhart, and of the subject matter of counts 2, 3, 5 and 7 to the party Vickery. Barnhart appeals from so much of the decision of the board as relates to counts 2, 3, 5 and 7, and Vickery appeals from so much of said decision as relates to counts 1, 4, and 6.

The interference arises between a patent, No. 2,050,554, issued to Barnhart on August 11, 1936 upon an application filed October 30, 1934, and an application of Vickery filed on August 23, 1934, which, it is stated in the application, is a division of a co-pending application filed June 6, 1933.

Both appeals will be disposed of in this opinion.

Count 1 is illustrative of the counts involved in Vickery's appeal, and count 2 is illustrative of the counts involved in Barnhart's appeal. Counts 1 and 2 read as follows:

"1. A tubular metallic golf club shaft having a grip portion at its upper end and a tip at its lower end, said shaft having contiguous upper and lower portions of circular cross section throughout, and said upper and lower portions being connected by a portion outwardly protruding from the upper portion and providing the upper terminus of the lower portion, said lower portion tapering to a minimum diameter in the tip region.

"2. A tubular metallic golf club shaft, having a grip portion at its upper end and a tip at its lower end, said shaft being of circular cross section throughout and comprising an upper portion and a lower portion, said upper and lower portions being interconnected by a shoulder outwardly protruding from the upper portion and affording the upper terminus for the lower portion, and the lower portion immediately below the shoulder tapering therefrom to a minimum diameter in the tip region, and the minimum diameter of the lower portion being less than the minimum diameter of the upper portion in the region adjacent the shoulder."

Vickery being the senior party, the burden was upon Barnhart to establish priority of invention with respect to all the counts by a preponderance of evidence.

Originally there was a third party to the interference who was eliminated by his filing a concession of priority to Vickery.

The nature of the involved invention is sufficiently described in the counts above-quoted.

The patent to Barnhart in interference contains seven claims, all of which were copied by Vickery and now constitute the counts of the interference.

The preliminary statement of Barnhart alleged conception of the invention embraced in all of the counts on or about March 1, 1926, and actual reduction to practice on or about October 1, 1926, and also on or about February 5, 1931. He also alleged diligence in reducing the invention to practice from March 1926.

Vickery's preliminary statement, as amended, alleged conception of the invention embraced in all of the counts and its actual reduction to practice on or about August 1, 1927; that he, at various times thereafter, again reduced the invention to practice; that prior to the filing of his application here involved he, on June 6, 1933, filed an application of which the involved application is a division, and on October 17, 1933, he filed another application for a patent; that each of said earlier applications disclosed the invention here involved; and he further alleged that he began exercising diligence in reducing the invention to practice on or about August 1, 1927.

No motion to dissolve the interference was made by either of the parties to these appeals. Such a motion was made as to count 3 by the party eliminated from the interference as aforesaid, but this motion was later withdrawn by him.

Both parties took testimony.

Barnhart offered in evidence an application for patent filed by him on September 12, 1932, but abandoned some time after the filing of his application upon which the patent here in interference was issued. It is claimed by Barnhart that said application of September 12, 1932, discloses the subject matter of all the counts here involved and was a constructive reduction to practice of the invention embraced in each of the counts.

The Examiner of Interferences held that said application of September 12, 1932 supported counts 1, 4, and 6, but did not support the other counts before us, and that Barnhart was entitled to the date of September 12, 1932 for constructive reduction to practice of the invention embraced in counts 1, 4, and 6. The examiner further held that Barnhart had not established conception or actual reduction to practice of the invention embraced in any of the counts prior to said date of September 12, 1932, and had not established conception or actual reduction to practice of the invention embraced in counts 2, 3, 5 and 7 prior to June 6, 1933, the filing date of Vickery's parent application, which application was held by the Examiner of Interferences to be a constructive reduction to practice of the invention as embraced in all of the counts. The examiner further held that if Barnhart was entitled to an earlier date for conception of the invention than as above stated, he had not established diligence in reducing the invention to practice.

The Examiner of Interferences held that Vickery had not established conception or actual reduction to practice of the invention embraced in any of the counts prior to June 6, 1933, the date of his parent application.

Accordingly, the Examiner of Interferences awarded to Barnhart priority of invention of the subject matter of counts 1, 4 and 6, and to Vickery priority of invention of the subject matter of counts 2, 3, 5 and 7.

Upon appeal the Board of Appeals affirmed the decision of the Examiner of Interferences in all respects.

There being concurring decisions of the Patent Office tribunals, the familiar rule is applicable that upon all questions of fact we are not at liberty to reverse the decision of the Board of Appeals unless its conclusions therein, affirming the conclusions of the Examiner of Interferences, are manifestly wrong.

We will first consider the question of whether Barnhart's abandoned application of September 12, 1932, disclosed the invention set forth in each of the counts before us. As hereinbefore indicated, the Patent Office tribunals held that said application disclosed the subject matter of counts 1, 4 and 6, but did not disclose the subject matter of the other counts.

It is Vickery's contention that while Barnhart's 1932 application recites that the shafts disclosed by him "are provided *with an increased section in the region near the head from which they again taper to the same diameter in the head,*" this language does not support the counts awarded to Barnhart for the reason that the counts should be construed as providing two separated regions of "flexation," one in the upper portion and the other in the lower portion of the shaft. Further, it is Vickery's contention that it was only upon this construction that Barnhart's patent claims were allowed over the cited prior art, and that Barnhart's 1932 application does not disclose two separated regions of "flexation."

We find in the record that, during the prosecution of the application upon which Barnhart's patent was issued, certain claims therein were rejected upon two patents, one to Pollock (Br.), No. 256,049, and the other to Brinkman, No. 1,653,428. One of the claims so rejected reads as follows:

"6. A tubular metallic golf shaft which is divided at a point between its ends by an outwardly protruding stiffening portion into two units of flexation, one of said units of flexation being tapered from said outwardly protruding portion towards the end thereof and said shaft being of uniform cross sectional shape throughout its length."

Certain claims of Barnhart's abandoned application were also rejected upon Pollock and Brinkman.

In the further prosecution of the application upon which his patent was issued, Barnhart made another claim which reads as follows:

"12. A tubular metallic golf shaft circular in cross section throughout and consisting of a tapered upper portion and a tapered lower portion, each configured to afford substantial flexation during use in a golf club and divided from one another, and connected by a shoulder outwardly protruding from the upper portion in the medial region of the shaft and affording an upper terminus for the lower portion, the lower portion being of maximum diameter at the crest of the shoulder and tapering to lesser diameter toward its tip end, and the upper portion being of minimum diameter at its lower end adjacent the shoulder, whereby the regions of maximum flexation of the two portions of the shaft are located respectively in the region immediately above the shoulder and in the region adjacent the tip of the club and the vibrations due to impact are damped."

In rejecting this and other claims of a similar nature the Primary Examiner stated:

"Claims 11, 12, 15, 17 and 18 are rejected as vague and indefinite. These claims include expressions such as 'configured to afford substantial flexation.' This expression is thought to be indefinite and not expressive of structure. The use of the word 'flexation' is questioned. It does not appear to have a definition in the dictionary. Therefore other expressions such as 'curvature of flexation' and 'maximum flexation' are also thought to be indefinite."

Thereafter the claims were amended, omitting therefrom all references to "flexation," and the claims were allowed.

From the foregoing it does not appear that the patent claims were allowed by the Primary Examiner upon the narrow construction which Vickery contends should be given to them in order to avoid the prior art.

Moreover the Examiner of Interferences in his decision stated upon this point as follows:

"The amendments preceding the withdrawing of the rejection on a combination of references and the affidavit of John Heddon had much to say of the Barnhart shaft providing two separated regions of flexibility of maximum flexation at the narrow parts of the upper and lower sections. However, the Primary Examiner in his action of February 1, 1936 required the cancelation of such language in the claims, and this feature, accordingly, could not have been the one that moved him finally to allow the claims. It would appear rather that the rejection upon a combination of references having effective dates in 1926 and 1927 was withdrawn because of the showing that the Barnhart club filled a long felt want which was not obvious to inventors in this fairly active art. Since the claims were rewritten to deliberately exclude such phrases that described the upper and lower portions of the club as being 'configured to afford substantial flexation during use in a golf club' and as having 'regions of maximum flexation * * * in the region immediately above the shoulder and in the region adjacent the tip' it would be improper to read into these counts those limitations that not only are not expressed, but which were deleted, at the Examiner's request, when the claims were rewritten.

*     *     *     *     *

"Returning to count 4, previously quoted in the table, it is believed that the history of the prosecution of the count as a claim in Barnhart's application does not require reading into the meaning of its terms any unexpressed limitation that would prevent it from reading upon Barnhart's 1932 application. The authorities, on the contrary, require that where the counts are not ambiguous they should be given the broadest interpretation their language will reasonably support. Writer v. Kiwad, 63 F.2d 259, 20 C.C.P.A., Patents, 869, 431 O. G. 263, 1933 C.D. 213; Woelm v. Hasselquist, 62 F.2d 367, 20 C.C.P.A., Patents, 806, 429 O.G. 501, 1933 C.D. 150. It is accordingly held that count 4 is readable upon the disclosure of Barnhart's 1932 application, exhibit 37."

The Board of Appeals in its decision stated: "Vickery's main contention, as stated on pages 222 to 237 of his brief, is that counts 1, 4 and 6 are not patentable over the Brinkman and Hoerle patents. Obviously, the question before us is not whether these counts are patentable to Barnhart, but whether the counts are supported by the early Barnhart application. We agree with the examiner that they are supported by the disclosure of Barnhart's early application. The Examiner of Interferences has fully considered the procedure in the early Barnhart case and correctly concludes that there is no warrant for reading limitations into counts 1, 4 and 6 as contended for by Vickery."

It is well established that where the Board of Appeals gives a broad interpreta-

tion to a count, we are not at liberty to inquire whether such broad interpretation renders the count unpatentable. Marshall and Levandosky v. Ledwinka, 67 F.2d 495, 21 C.C.P.A., Patents, 728.

■ Furthermore, we would observe that count 5 recites that the "upper and lower portions" of the shaft are "connected in the *medial region* of the shaft by a portion which outwardly protrudes from the upper portion * * *." (Italics ours.) Counts 1, 4 and 6 omit the limitation referring to the medial region of the shaft. Therefore it would be improper to read into said counts 1, 4 and 6 said limitation in count 5. Oldroyd v. Morgan, 57 F.2d 358, 19 C.C.P.A., Patents, 1111.

Finally, upon this branch of the case, it appears to us that Barnhart's 1932 application discloses two separate portions of a golf shaft divided by a protuberant shoulder. The application is for a set of golf clubs and the drawing discloses two shafts with wooden heads, known as "woods," and nine shafts with iron heads, known as "irons." While, with respect to the "woods," the "increased section" is quite near the head, and the taper from that point to the tip of the shaft is relatively short, the application states, after describing the "increased section in the region near the head," as shown in the drawings of the "wood" clubs, as follows:

"* * * It will be understood that this same construction may ' be employed in making the irons with substantially the same results as are obtained in the shafts shown in Fig. 1. In this case, however, the number 1 iron would have a point of increased section near the club head and this point of increased section would rise toward the grip in progressive increments from the number 1 to the number 9 iron."

Although this language is indefinite as to the points on the iron clubs where the "increased section" occurs, it is clear that in a number 9 iron, for instance, such section would be substantially higher on the club than the increased section in the "wood" clubs shown in the drawings, and we are satisfied that, as to the number 9 club, at least, there would be two portions of the club each having substantial flexure.

Therefore we are in agreement with the Patent Office tribunals that Barnhart's September, 1932, application supports counts 1, 4 and 6.

Vickery contends that Barnhart's application upon which his patent was issued, and his issued patent, contain a disclaimer which prevents a holding that his 1932 application discloses the subject matter of counts 1, 4 and 6. This alleged disclaimer reads as follows: "In the golf club of the present invention, howsoever constructed, two separated regions of maximum flexation will be afforded, one near the lower end and one above the shoulder * * *."

■ However, as observed by the Examiner of Interferences in his decision, neither Vickery nor Barnhart moved to dissolve the interference. If Vickery believed that counts 1, 4 and 6 should not have been allowed as claims in Barnhart's patent application by the Primary Examiner, we think he should have moved to dissolve the interference upon the ground that Barnhart, by reason of the alleged disclaimer, was estopped from making claims constituting counts 1, 4 and 6; and, failing to do so, Vickery could not thereafter rely upon estoppel of Barnhart.

We have found no authority upon this point, but it seems reasonable that if Barnhart is estopped by his alleged disclaimer from relying upon his 1932 application, he is likewise estopped from making claims corresponding to counts 1, 4 and 6 in his application upon which his patent was granted. Inasmuch as the broad claims constituting counts 1, 4 and 6 were allowed in Barnhart's patent, and, in our opinion, they read upon his 1932 application, we think that Vickery is not entitled to raise the question of disclaimer, having failed to make a motion to dissolve the interference upon the ground that Barnhart was estopped from making claims corresponding to counts 1, 4 and 6.

However, regardless of the question of estoppel of Vickery to raise the question of disclaimer, we are of the opinion that both Barnhart's patent application and his 1932 application disclose two separated regions of increased flexibility, one above the shoulder and the other below it, and it is clear to us that Barnhart's alleged disclaimer did not contemplate two separate regions of the shaft of equal flexibility, for the alleged disclaimer is silent upon that point.

■ From all the foregoing we are of the opinion that Barnhart is entitled to the filing date of his 1932 application for constructive reduction to practice of the invention embraced in counts 1, 4 and 6.

With respect to counts 2, 3, 5 and 7, we are in agreement with the Patent Office tribunals that Barnhart's 1932 application does not disclose the entire subject matter of these counts. Counts 3 and 5 contain the limitation that the upper and lower portions of the shaft are connected in the medial region of the shaft by a shoulder or outward protrusion formed in the upper portion of the shaft.

While, as hereinbefore stated, we hold that shafts referred to in Barnhart's 1932 application support counts 1, 4 and 6, where the connection between the upper and lower portions of the shaft is not confined to the medial region of the shaft, we find nothing in said application clearly disclosing the location of such connection in the medial region of the shafts.

The Examiner of Interferences in his decision, discussing counts 3 and 5, stated:

"It is believed obvious that the shoulder I or I' on the wood clubs of the Barnhart 1932 application can not properly be described as being in the medial region of the shaft. The specification of the 1932 application states that this same construction may be employed in making the irons with substantially the same results as are obtained in the shafts shown in Figure 1 of that application (page 7, top). 'In this case, however,' the specification continues, 'the number 1 iron would have a point of increased section near the club head and this point of increased section would rise toward the grip in progressive increments from the number 1 to the number 9 iron.' Since this modification composing a set of irons is not illustrated, it is a matter of conjecture just where the point of increased section or shoulder would be in the number 9 iron. If the increments were taken as comparable in length to the increments in Figure 1 (suggested as two inches on page 6, lines 5 and 6) the shoulder in the number 9 iron might be similarly placed to the shoulder in the irons of the Barnhart patent and could be described as being in the medial region of the shaft; but this would be based on the assumption (there is no statement to that effect in the specification) that the increments in the one form of the 1932 application are the same length as those in the other. Whether it is possible or probable that Barnhart intended the shoulder of the number 9 iron to be in the medial region is immaterial; for even if he actually intended it to be so is of no moment if his disclosure did not so show or describe it. Since this feature is not disclosed with certainty in the 1932 application of Barnhart, it is held that the application does not support counts 3 and 5."

We are in accord with these views of the Examiner of Interferences.

With respect to counts 2 and 7, which do not contain the limitation with respect to the medial portion of the shaft, the Examiner of Interferences in his decision stated:

"The remaining counts 2 and 7 contain the restriction, the minimum diameter of the lower portion being less than the minimum diameter of the upper portion in the region adjacent the shoulder'. It is believed that it can not be said with certainty that this feature is disclosed in Barnhart's 1932 application. The dimensions in the drawing are so close that any difference in the minimum diameters could be attributable to a draftsman's error. The specification states (page 6, lines 20 et seq.) that the shafts taper uniformly throughout substantially their entire length but are provided with an increased section in the region near the head from which they again taper to the same diameter in the head. The 'same diameter' is believed to mean the same minimum diameter as had been reached in the tapered section just above the shoulder. The feature described in the last phrase of counts 2 and 7 is thus not clearly shown in Barnhart's 1932 application, and it is therefore held that the application does not support counts 2 and 7.

"It may be noted that Barnhart did not present claims to the features discussed in the two preceding paragraphs in his 1932 application, and apparently had to file the 1934 application before he could obtain claims thereto."

Counsel for Barnhart vigorously challenge this holding of the Examiner of Interferences last above quoted, and affirmed by the Board of Appeals. In their brief it is stated:

"Count 2 is also disclosed in Fig. 2 of the Barnhart 1932 application, as is clearly evidenced by the drawing showing the tip end of the shaft to be of less diameter than the portion of the shaft above and immediately adjacent the shoulder I (I').

"There is nothing in the specifications of this application to refute this showing. The recital in the specification that the shafts of Fig. 2 again taper from the shoul-

der to the same diameter in the head clearly does not mean, as held by the Examiner of Interferences, that the 'diameter in the *head*' is the same as the minimum diameter of the shaft *above the shoulder;* it means rather that the diameter of the shafts of the two wood clubs at the tips, considering these two clubs *collectively,* is the same in *each,* which is logical, as the sockets or hosels in wood club heads of different styles are of the *same diameter.*"

It is well established that drawings alone in a patent application cannot form the basis of a valid claim, and the fact that "There is nothing in the specifications * * * to refute this showing" (of the drawing) is immaterial.

In the case of Permutit Co. v. Graver Corp., 284 U.S. 52, 60, 52 S.Ct. 53, 55, 76 L.Ed. 163, the court stated: " * * * Moreover, while drawings may be referred to for illustration and may be used as an aid in interpreting the specification or claim, they are of no avail where there is an entire absence of description of the alleged invention, or a failure to claim it. The statute requires the patentee not only to explain the principle of his apparatus and to describe it in such terms that any person skilled in the art to which it appertains may construct and use it after the expiration of the patent, but also to inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not. * * * "

It is a circumstance worthy of note that Barnhart continued the prosecution of his 1932 application long after the filing date of his patent application, but in that prosecution presented no claims containing limitations such as are embraced in counts 2, 3, 5 and 7. According to the record before us the claims of the two applications were prosecuted simultaneously from October 30, 1934, until August 26, 1935, which last-named date was the date of the last Office action upon the 1932 application; and, as stated by the Examiner of Interferences, Barnhart evidently was of the opinion that it was necessary to file a new application in order to secure the allowance of claims corresponding to counts 2, 3, 5 and 7.

Paraphrasing language used by us in the case of In re Adams, 117 F.2d 1017, 1018, 28 C.C.P.A., Patents, ——, Patent Appeal No. 4435, decided during the present term, it is clear to us that if Barnhart, at the time his 1932 application was filed, had a conception of the invention embraced in counts 2, 3, 5 and 7, he would have made some attempt to describe it in "full, clear, concise, and exact terms," as the statute requires. This he failed to do.

Not being convinced that the Board of Appeals erred in holding that Barnhart's 1932 application failed to disclose the subject matter of counts 2, 3, 5 and 7, we must affirm its holding that Barnhart is not entitled to the date of such application for constructive reduction to practice of the invention embraced in each of said counts.

Both tribunals of the Patent Office held that Vickery's parent application, filed June 6, 1933, disclosed the elements of each of the counts before us, and that he was entitled to that date for constructive reduction to practice of the invention embraced in each of the counts.

While Barnhart's reasons of appeal include an assignment of error on the part of the Board of Appeals in awarding to Vickery said date of June 6, 1933, for constructive reduction to practice of the invention, Barnhart's counsel have in their briefs made no contention as to this point. Therefore, without discussing the matter further, we deem it sufficient to say that we find no error in the holding of the board that Vickery is entitled to said date of June 6, 1933, for constructive reduction to practice of the invention as embraced in each of the counts.

We will next consider the claims of the respective parties to conception and actual reduction to practice of the invention embraced in the counts prior to June 6, 1933, the filing date of Vickery's parent application.

It is established that the shafts relied upon by Vickery for conception and actual reduction to practice of the invention consisted of two sections, a part of the upper or grip portion being driven or telescoped into the upper end of the lower or head portion. Sometimes the telescoped portions were fastened by a rivet, but usually not as the driving of the upper portion into the lower portion created a very tight fit.

It is evident that the telescoped portions of the shaft created an area of stiffness compared with other tapered and flexible portions of the shaft, and that the top of the lower portion being on the outside of the bottom of the upper portion, a shoulder was created. Each of the counts, however,

recites that the "shoulder" referred to in counts 2, 3, 6 and 7, and by equivalent language in the other counts, protrudes *from the upper portion* and provides the upper terminus of the lower portion.

It is clear to us that Vickery's two-piece shafts do not support the element of the counts last above referred to, and therefore said two-piece shafts cannot be held to embody the invention embraced in the counts, and accordingly consideration of the evidence relative to such shafts is unnecessary.

With respect to Vickery's claimed earlier conception and reduction to practice of the involved invention, the Examiner of Interferences in his decision stated: "While the Vickery record contains some early suggestions that Vickery intended to make his shafts eventually in one piece, the first definite showing of the structure of such a shaft is found in his letter of March 9, 1933 included in his exhibit X (see page 15 of his printed brief, paper No. 97). Since Barnhart has been accorded a constructive reduction to practice on September 12, 1932 as to counts 1, 4 and 6, it is evident that he is the first to conceive and reduce to practice the invention defined by those counts, and priority as to them will be awarded to Barnhart."

We are in agreement with the view of the Examiner of Interferences, affirmed by the Board of Appeals, that Vickery has not established conception or reduction to practice of the invention prior to the filing date of Barnhart's early application, September 12, 1932.

We next come to the consideration of the testimony in behalf of Barnhart relative to his claimed conception and actual reduction to practice of the invention embraced in the counts.

The evidence upon this point was fully analyzed by the Examiner of Interferences in his decision, and his conclusions thereon were stated as follows:

"Viewing this evidence as a whole, it seems apparent that Barnhart, upon whom the burden lies of proving his case by a preponderance of the evidence, has not satisfactorily established by corroborating witnesses that he had, prior to June 6, 1933, a golf club embodying the invention defined in counts 2, 3, 5 and 7.

\*　　\*　　\*　　\*　　\*　　\*

"Vickery has put in evidence copies of a large number of the Barnhart patents,

and his correspondence with Arthur Morgan, who testifies relative to the early efforts in the promotion of his machine. If Barnhart had in mind the invention of these counts at an early date, it would be strange that such a structure was not made the subject matter of an application or at least discussed in his letters. Barnhart's reticence to testify of Arthur E. Morgan (Barnhart record, page 191, et seq.) and Thum (page 193, et seq.), is particularly marked in view of the evidence produced by Vickery as to their backing and interest.

Vickery's conception and reduction to practice is established by the filing of an application for patent on June 6, 1933. Both as to date and subject matter such proof constitutes evidence of a peculiarly definite and satisfactory character, and distinctly different from the evidence offered by Barnhart as to his alleged activities prior to 1933 with the invention defined in counts 2, 3, 5 and 7. For the reasons previously pointed out, it is held that Barnhart's proofs do not satisfactorily establish conception of the invention of those counts prior to the late spring or early summer of 1933.

\*　　\*　　\*　　\*　　\*　　\*

"The evidence is believed clearly insufficient to hold that Barnhart was continuously using reasonable diligence from a time just prior to June 6, 1933 until October 30, 1934. The testimony relative to seeking to interest manufacturing companies is very general in its nature as to efforts during the summer of 1933 and later, and these efforts would appear to be directed primarily towards the commercial promotion of the shafts. It may also be noted that no attempt was made to prosecute the subject matter of counts 2, 3, 5 and 7 in the 1932 application. Priority as to these counts, accordingly, will be awarded to Vickery on the ground that Barnhart, even if he was the first to conceive their subject matter, was the last to reduce that invention to practice, and was not diligent in so doing."

The Board of Appeals in its decision expressed its agreement with the above-quoted conclusions of the Examiner of Interferences. Upon the question of the diligence of Barnhart, the board stated: "As to Barnhart's diligence, he contends that he is under no special obligation of diligence and he does not allege that he was diligent during the critical period. The Examiner of Interferences ruled that even

if Barnhart conceived the invention in issue prior to Vickery's filing date, he did not exercise the proper diligence in reducing the invention to practice by waiting until October 30, 1934 to file his application for patent. We agree with the Examiner of Interferences."

With respect to Barnhart's claimed early conception and reduction to practice of the involved invention, purely questions of fact are presented, and the rule is here specially applicable that concurring decisions of the Patent Office tribunals upon questions of fact will not be disturbed by us unless they are manifestly wrong.

█ It would unduly extend this opinion were we to discuss at length Barnhart's activities upon which he relies to establish an actual reduction to practice of the involved invention. Our inquiry here is limited to the question of whether the Patent Office tribunals were manifestly wrong in holding that Barnhart had not established conception or reduction to practice of the involved invention prior to the filing date of Vickery's patent application, June 6, 1933, or that, if Barnhart is entitled to a date for conception prior to June 6, 1933, he was not diligent in reducing the invention to practice immediately prior to and after Vickery's entrance into the field.

The Examiner of Interferences in his decision calls attention to the following: that, although Barnhart was a prolific inventor and has secured a number of patents, one of which was for a golf shaft, the application for which was filed December 13, 1926, he did not, until October 30, 1934, file an application for the invention embraced in counts 2, 3, 5 and 7, although Barnhart claims to have conceived and reduced to practice the invention embraced in said counts in 1926.

In addition to this, we would observe that if Barnhart was in possession of the invention embraced in counts 2, 3, 5 and 7 prior to the date of his 1932 application, it is strange that it was not distinctly described in his said application.

The Examiner of Interferences in his decision stated: "The only golf club offered in evidence by Barnhart as embodying the invention at a date prior to the filing of Vickery's first application is exhibit 2, which Barnhart states he had in 1926 (Barnhart printed record, pages 151, 159, 170). The party's testimony, under the long established doctrine of corroboration, can not by itself establish that assertion, and a consideration of the witnesses offered to corroborate the party Barnhart on this matter is therefore necessary. * * *"

Concerning the golf club, Exhibit 2, which Barnhart testified he made and used in 1926, it was established by Vickery that the club head of said exhibit was not produced until after March 29, 1928.

One Raddatz, a rebuttal witness for Barnhart, testified that he was a golf club maker; that he was employed at the Annandale Golf Club in Pasadena, California, during the winters of 1924–1925, 1925–1926, 1926–1927, and again in the winter of 1930–1931; that the shaft of Exhibit 2 was brought to him "one of the early winters I worked there," and that he then mounted a head upon the same.

One Malley testified that he was a club maker and golf instructor employed at the Annandale Golf Club from April 18, 1923, until February 15, 1932; that the club head now forming a part of Exhibit 2 was placed thereon by said Raddatz. Malley testified to no date when Raddatz fitted the head on Exhibit 2. He did testify, however, that he (Malley) made golf clubs for Barnhart at different times from 1924 to 1935.

Barnhart's counsel contend that Raddatz might have fitted the club head on Exhibit 2 in the winter of 1930–1931, and that Raddatz' mistake as to the time, if any, was negligible. Barnhart's counsel further contend that the shaft of Exhibit 2 was drawn, according to the testimony, in 1926, and that it was first fitted with a head different from that now found upon it, and that the head now found upon it was fitted in 1930–1931.

We think this was possible of course, and no doubt this possibility was considered by the Patent Office tribunals in arriving at their decisions.

Another circumstance appearing in the record is Barnhart's relations with one William Thum of Pasadena, California, and Arthur Morgan, President of Antioch College, Yellow Springs, Ohio, from 1925 to 1933. It appears from Mr. Morgan's testimony that Thum was a contributor to Antioch College, and, learning of certain inventions of Barnhart, Thum decided to associate himself with Barnhart in the commercialization of the latter's in-

ventions, the net proceeds to Thum to go to said college. Morgan testified that Thum entered into a contract with Barnhart in February 1926 by which Thum agreed to invest with Barnhart an estimated $10,000, for which he, Thum, was to receive a one-half interest in Barnhart's development of his inventions for the benefit of Antioch College; that in June, 1926, Barnhart visited Morgan at Antioch College, and that later, on two occasions, Morgan went to California and visited Barnhart's shop. Morgan testified that he sought to commercialize Barnhart's inventions disclosed to him, but was unsuccessful, and that most of his activities were during the years 1926 and 1927.

Morgan testified that Barnhart showed him three golf shafts produced by a machine, the invention of which machine he, Morgan, was endeavoring to commercialize, Barnhart testified that his Exhibit 2 was produced on such a machine in the early part of 1926. With respect to the invention involved in this interference Morgan testified as follows:

"Q. 9. I hand you the drawing of Barnhart patent #2,050,554 involved in this controversy, and a copy of which patent is included in Vickery Exhibit B, and ask you if at any time Mr. Barnhart ever showed you a golf club shaft. like that illustrated in the drawing of this patent? A. So far as I can recall, I never saw a shaft of his of that character.

Morgan further testified. that Thum, before the contract with Barnhart was terminated, had furnished Barnhart about $30,000.

For some reason Barnhart seemed very reluctant to testify concerning his relations with Thum and Morgan. He testified that he never knew where Morgan lived, and did not know why he was taking an interest in putting his tapering tube process into use.

With regard to Thum, Barnhart testified in part as follows:

"XQ. 212. Who was William Thum?
 *   *   *   *   *   *

"A.  A man.

"XQ. 213. Did you have any contact with him in connection with this work that you have testified you were doing in connection with tube tapering machines and processes during the years 1925, '6, '7 or thereafter?
 *   *   *   *   *   *

"A.  Yes.

"XQ. 214. And what was the nature of this contact with him?
 *   *   *   *   *   *

"A.  I believe he wanted to see the process put to use.

"XQ. 215. And did he do anything in the effort to accomplish this?
 *   *   *   *   *   *

"A.  He might have.

"XQ. 216. Mr. Barnhart, are you being entirely frank? A. I believe so.
 *   *   *   *   *   *

"XQ. 225. Did Mr. Thum assist in the financing of the work you were doing? A. He might have.

"XQ. 226. Well, now, Mr. Barnhart, as a matter of fact, he did, didn't he? A. I testified that he might have.

"XQ. 227. And I am now asking you if it was not the absolute fact that he did do so? A. Did do what?

"XQ. 228. Assist in the financing of the work you were doing? A. He might have helped.

"XQ. 229. I am not asking about probabilities; I am asking for facts. What is the fact? A. I am giving you facts.

"XQ. 230. All that you have told me so far is that he might have, which means to me that perhaps he did and perhaps he didn't, and that you don't know whether he did or not. Now, I am asking you if as a matter of fact you do know that he did contribute to the financing of this work? A. I don't want you to feel me obstinate, Mr. Slough, but I am giving you the information to the best of my ability."

It is only fair to note here that several witnesses testified in behalf of Barnhart in rebuttal, their testimony being to the effect that he is a man of the highest character as to honesty and integrity. There is much factual testimony favorable to Barnhart. We have referred at some length to testimony and circumstances not favorable to him only for the purpose of making plain that we could not properly hold that the Patent Office tribunals were manifestly wrong in holding that the earliest date to which Barnhart is entitled for conception and reduction to practice of the invention embraced in counts 2, 3, 5 and 7 is subsequent to June 6, 1933, the filing date of Vickery's parent application.

It follows from the foregoing that we must affirm the decision of the Board of

Appeals awarding to Barnhart priority of invention of the subject matter of counts 1, 4 and 6, and to Vickery priority of invention of the subject matter of counts 2, 3, 5 and 7.

In conclusion we feel it our duty to call attention to the undue length of briefs of counsel in this case. The briefs of Barnhart consist of 217 pages, and those of Vickery consist of 367 pages. Their briefs would have been of much greater assistance to the court had they been condensed to one-half their length.

Furthermore the principal brief for Vickery is replete with references to, and quotations from an alleged brief in behalf of Barnhart before the Board of Appeals. This brief is no part of the record certified to us. Under these circumstances it was obviously improper to refer to or quote from said brief. In re Britton, 115 F.2d 249, 28 C.C.P.A., Patents, ——, Patent Appeal No. 4373.

We also find references in Barnhart's principal brief to Office action and quotations from papers in the Patent Office, for which we can find no basis in the record, and the observations we have made with reference to Vickery's brief are also applicable to the brief of Barnhart.

Other matters relating to certain motions before the Patent Office tribunals are included in the reasons of appeal of Barnhart and of Vickery, but inasmuch as they were not argued in the briefs of the parties or before us orally, we have assumed that such reasons of appeal have been abandoned.

It follows from the foregoing that we are not convinced that the Board of Appeals erred in holding that Barnhart is entitled to priority of invention of the subject matter of counts 1, 4 and 6, and that Vickery is entitled to priority of invention of the subject matter of counts 2, 3, 5 and 7.

Therefore, the decision of the Board of Appeals with respect to both appeals is affirmed.

Affirmed.