JAMES HEDDON'S SONS et al. v. AMERICAN FORK & HOE CO.

No. 9842.

Circuit Court of Appeals, Sixth Circuit.

April 4, 1945.

Ephraim Banning, of Chicago, Ill. (Samuel W. Banning and Banning & Banning, all of Chicago, Ill., on the brief), for appellants.

Frank M. Slough, of Cleveland, Ohio, for appellee.

Before SIMONS, MARTIN, and McALLISTER, Circuit Judges.

SIMONS, Circuit Judge.

Some 30 or 35 years ago golf club manufacturers began substituting tubular steel shafts for the conventional hickory shafts in golf clubs. It was thought as disclosed by Knight in his patent No. 976,267, that hickory offered but small resistance to tortional strain, causing the club head to twist upon impact, and so to make the flight of the driven ball uncertain and irregular. Knight, among others, observed, the need of suppleness in a golf shaft to suit the taste of the individual player, some preferring it to be near the head and others near the middle of the shaft, the "feel" of the club dominating these preferences.

He asserted that in a steel shaft the metal may be so distributed that suppleness can be achieved at any desired point.

Earlier it had been found that tubular steel shafts of unvarying diameter were either too stiff to provide the desired "whip," or, if light enough to be flexible, proved fragile. Knight preferred a straight tapered tube with suppleness near the head, as in the ordinary tapered hickory shaft. The art of steel shaft manufacture developed rapidly, as disclosed by many British and American patents and prior uses, all having for their objectives, points or areas of flexation in the shaft by which length and accuracy of drive was hoped to be obtained and the elusive quality of "feel" given to the club. Undoubtedly some of the improvements marked· meritorious advances in the art, while others furnished mere "talking points" appealing to the type of golfer who, with the hope that springs eternal, periodically seeks to lower his handicap by transactions in the "pro" shop rather than by sweating it out on the practice tee.

This evolution continued so that Cowdery, an executive of the appellee, could justifiably observe, in 1933, in a letter to Vickery, "we have certainly been bewildered with a multiplicity of ideas lately on shafts with different points of flexure. Kroyden are talking it—Heddon's are sending out samples, and Wilson's have also got the same bug—all of them apparently claiming originality. Mr. Walker Hackett, of British Steel Golf Shafts, Ltd., * * * showed us samples of such shafts, also illustrations taken from their British Curved Taper Patents, showing shafts with about every point of whip covered, and any combination of points of whip, covered by their Curved Taper Patents." Into this art, which the Court of Customs and Patent Appeals in Vickery v. Barnhart, Cust.&Pat.App., 118 F.2d 578, characterized as crowded, came Barnhart patent No. 2,050,554, issued August 11, 1936, on an application filed October 30, 1934, the claims of which are here in suit. Like those who preceded him, Barnhart thought it desirable to configure the shaft and proportion the taper so as to produce variations in the "feel" of the club, as a matter of major importance in the minds of discriminating users. The earlier expedients to accentuate flexation had been, he thought, based upon the assumption that it was desirable to progressively decrease the diameter of the shaft, either by continuous tapering or by a stepping-down arrangement from the grip toward the head. His invention, he recites, differs from prior practice in that the shaft is functionally divided into two portions by a region of abrupt transition in diameter which in effect separates the shaft as a whole into two units of flexation, one of which extends from the handle to the medial region, and the other from the medial region to the head, duplicating the taper in different portions of the shaft. It is thereby possible, he thought, to vary the action of the shaft with the resultant "feel" so as to meet individual requirements. The characteristic feature of the invention resides in the fact that a medial bulge or shoulder abruptly increases the diameter of the upper end of the lower shaft portion as compared with the diameter of the lower end of the upper shaft portion, and so affords a division or barrier causing each portion of the shaft to flex in conformity with the requirements of its own configuration. Continuity of action is interrupted by a region of increased stiffness in the medial portion of the shaft, so that flexibility is distributed in a distinctive manner and centered in two separated regions. The Barnhart shaft is accordingly referred to as a shaft having a "reverse taper," or as being a "step-up shoulder shaft."

The Barnhart patent was put into interference with an application of Vickery, the appellee's assignor, which eventually issued as patent No. 2,250,429. The broad claims were awarded to Barnhart and the narrower ones to Vickery. The appellant here contends that Barnhart is entitled to all of the claims. The history of the interference proceeding will not be reviewed. It is sufficiently set forth in Vickery v. Barnhart, supra. It is only necessary to observe, in passing, that the appellants contended in the court below that priority to all claims should have been awarded to Barnhart by reason of new evidence first discovered by Heddon, Barnhart's licensee, in 1941, after the termination of the interference proceeding. This consisted of an abandoned application filed by Barnhart on April 13, 1926, which the appellants claim disclosed the idea of locating a reverse shoulder in the medial region, and so was proof that Barnhart had the complete invention, long prior to the date of conception, assigned to Vickery. Knowledge of this application the appellants say was suppressed by Barnhart dur-

ing the interference, for the reason later discovered that Barnhart, in 1926, was obligated by contract with parties representing Antioch College, to transfer to them rights in golf club inventions. The district court found it unnecessary to consider the question of priority because of its conclusion that the Barnhart patent disclosed no inventive novelty, and it is to this question that we must first address ourselves.

■ Barnhart's idea that the flexibility of the shaft should be concentrated in an area remote from the head of the club, was not new. Long before steel shafts came into general use, it was proposed to achieve this flexibility by thinning the desired part of the wooden shaft in various ways. The Fox British patent No. 24,144 (1911) shows a wooden shaft tapering both ways from the center, which is the thickest part of the shaft, for the purpose of increasing the "spring" of the shaft, "inasmuch as the spring action commences at a point nearer to the handle than is the case in a club of ordinary construction." The same idea was used by L. A. Young Company about 1932, for its "bi-taper" steel shafts. Fox may have put the upper area of flexibility too high for best results, but clearly the problem was understood. The Riordan British patent No. 10,431 (1906) shows a shaft thinned in the desired plane so as to increase flexibility in the region of thinning. "Flats" are provided to act as a hinge while the shaft is widened in the opposite plane to avoid weakening it. There is no abrupt shoulder, as in Barnhart, nor is the shaft uniformly circular in cross-section, but it does have multiple areas of varying flexibility. Fox and Riordan worked with wooden shafts, but such suggestion as they present of the desirability of areas of flexibility remote from the head, is not thereby precluded from consideration because mere substitution of materials is not invention. Potts v. Creager, 155 U.S. 597, 15 S.Ct. 194, 39 L.Ed. 275. Besides, steel shafts were admittedly old, as earlier disclosed by Knight, supra, and the British patent to Saunders, 3288 (1913), and the Riordan idea had already been adapted to a steel shaft in Pollack British patent No. 256,049 (1926). It may be that the Riordan-Pollack shafts were impractical because of erratic action induced by the "flats," although the testimony of the experts who tried them out does not substantiate this contention.

Brinkman No. 1,653,428, proposed to solve the problem of flexibility by varying either the thickness of the tube or the diameter, though Brinkman does not seem to have thought of putting the point of flexibility anywhere except near the head. While this prior art does not establish anticipation, it demonstrates that there was a complete appreciation on the part of those working in the art, of the desirability of areas of flexation, and it would seem to require but simple routine experimentation, well within the skill of the art, to determine the area in which suppleness would be most desirable. Older golfers will recall the club maker in the golf shop, in the days of hickory shafts, who, with lathe or file or sandpaper would vary the diameter of shafts to suit individual requirements, the whippy shaft for the less robust, and the stiffer shaft for the more powerful golfers.

■ Be that as it may, it is clear that Vickery achieved two separate areas of flexation in a number of two-piece shafts which he made as a "pro" from 1927 to 1933. They had two similarly tapered portions, as in Barnhart, with an abrupt bulge at the point of juncture resulting from the grip end of the shaft being driven into and firmly attached to the head end. While there doubtless was weakness in the Vickery construction, and the patent examiner refused to consider Vickery's practice as anticipation on the ground that the shoulder "outwardly protruded," as recited in the Barnhart claims, was not applicable to a sleeve arrangement, it does not, under familiar rules, amount to invention, at least in most circumstances, to make an element in one piece where formerly it had been made in two. 1 Walker on Patents, 196; Cleveland Punch & Shear Works Co. v. E. W. Bliss Co., 6 Cir., 145 F.2d 991, pp. 991, 998.

There still remains the need of considering Barnhart's advance in the art, if any, to determine whether what he accomplished was such marked improvement in golf shafts as to justify the granting of a monopoly, notwithstanding the application of general principles governing tests of invention. The essence of the Barnhart concept urged upon us, is the improvement made by Barnhart in the functioning of the shaft, demonstrated by the improved "feel" of the club in actual play. It is conceded that the repeated reference to "feel" as a sensory criterion in the literature of record, is difficult of exposition, and assert-

ed that the "feel" of a golf club is a very elusive, though highly important thing. It is sought to be demonstrated that Barnhart so combined flexibility and stiffness, using the terms relatively and not in an absolute sense, that a good player would be enabled to swing the club unfailingly and accurately through a predetermined path of movement. A characteristic contributing to this elusive quality of "feel" is urged upon us with seemingly scientific erudition, when it is said that the vibrations in the shafts are interrupted by its increased diameter in the medial region, thus eliminating the production of undesirable sensations communicated to the hands of the player, commonly denominated as "sting," and it is asserted with perhaps unconscious hyperbole, that "a club of the right balance and weight (the Barnhart, of course), almost propels itself through each stroke clear to and beyond the ball."

When, however, such famous golfers as "Bobby" Jones, Horton Smith, Ben Loving, and others, tried out the patented shafts in actual play and deposed that when the ball was hit cleanly there was a proper "feel" to the club without "sting," but that when the ball was "topped" or hit with the sole of the club there was the same vibration and "sting" as in other clubs under like circumstances, the appellants sought to discredit this testimony by observing that such skilled players "could undoubtedly win tournaments with a home-made shinny stick and thus do not need the advantage afforded to the work-a-day amateur," forgetting that in the interference proceeding they had relied upon affidavits of merit by Melhorn and Ghezzi, tournament players with almost, if not equal skill. If the question of "feel" is to be left to the "duffer" may it not truly be said that a particular club has a differing "feel" to different golfers depending upon strength of hands, wrists and forearms, and the perfection of style or "form," and is it not common experience that the "feel" of any club in the hands of the same golfer varies from day to day with the state of his digestion, hours of sleep, regularity of habit, and changes in weather? What older golfer does not retain in his bag some ancient product of the club maker's art which to him has a sweet "feel" and which gets results, even though it does not respond to progress in the art, just as the bee whose weight of body in relation to wing spread defies all the laws of aero-dynamics, yet indubitably flies?

We are not impressed by the record that Barnhart's contribution marked such advance in the art that it is necessary to resort to that liberality of construction which, upon occasion, as in Eibel Process v. Minnesota Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523, has saved a doubtful patent from invalidity. Heddon claims to have spent $100,000 to exploit the patent and to have achieved substantial commercial success. What happened, as disclosed by the voluminous record, is that Heddon, who was himself an ardent golfer, was so impressed in 1929 or 1930 by Barnhart's ideas and his process and mechanism for imparting taper to steel shafts, that he undertook to develop the Barnhart concepts commercially. In a sharply competitive field, however, he wished patent protection, and kept importuning Barnhart to file an application, not only for double taper shafts, but for multiple taper shafts, and even for designs. It was not until 1934 that Barnhart filed his application. Neither his difficulty nor Heddon's was in determining the desirable area of flexation. It was in perfecting a machine and dies to commercially vary the diameter of the shaft, and to determine from metallurgists the desirable texture and hardness of steel for the shaft. The patent, however, discloses a product and neither a process nor machine. If Barnhart had patentable concepts upon method or mechanism, they are not here in issue.

The contention that the appellee, as assignee of Vickery, is estopped to challenge validity by reason of Vickery's sustained efforts in interference to obtain the Barnhart claims, must be rejected. Reliance is placed upon Cutler-Hammer Mfg. Co. v. General Electric Co., 7 Cir., 6 F.2d 376, and Roth v. Harris, 2 Cir., 168 F. 279. These cases must, however, yield to controlling authority, Haughey v. Lee, 151 U.S. 282, 14 S.Ct. 331, 38 L.Ed. 162; Paramount Corporation v. Tri-Ergon Corporation, 294 U.S. 464, 477, 55 S.Ct. 449, 79 L.Ed. 997, and our own decisions in Kellogg Switchboard & Supply Co. v. Michigan Bell Telephone Co., 6 Cir., 99 F.2d 203 and McCloskey v. Toledo Pressed Steel Co., 6 Cir., 30 F.2d 12, in view of the principle that the public has always an interest in the improvident grant of an unmerited monopoly. Indeed, the Seventh Circuit Court of Appeals seems to have departed from the doctrine applied in the Cutler-Hammer

234

case, by its adjudication in Allbright-Nell Co. v. Autosteam Process Co., 7 Cir., 70 F. 2d 959. As for the observation by the Court of Appeals for the Second Circuit in Roth v. Harris, supra, that "men do not struggle for years to. secure a valueless thing," we doubt that such observation would now be made 'in view of file wrapper history and adjudications in numerous patent cases which demonstrate, beyond all question, that inventors, without number, do that very thing.

In view of our conclusion that Barnhart's claims are invalid for lack of invention, it becomes unnecessary to consider questions of priority or infringement, and

The judgment below is affirmed.